The Kaiser versus ThyssenKrupp Malpaca, Mr. Olson. The Kaiser versus ThyssenKrupp Malpaca, Mr. Olson. The Kaiser versus ThyssenKrupp Malpaca, Mr. Olson.  If it pleases the court, my name is Joseph Olson and I have the privilege of representing Wapakafoundry in this case. And this is a unique case. It is not, as the plaintiffs have suggested, a run-of-the-mill donning and doffing case. Instead, this case is the only case in which a district court has certified a class when the donning and doffing and showering activities are not required by the law and are not required by the employer. Instead, the compensability of these activities will turn on whether or not the plaintiff can prove that these activities are required by the very nature of the work they perform. The district court has articulated the legal standard as requiring the plaintiffs to prove that changing clothes and showering at work, as opposed to somewhere else, will significantly reduce the risk of health to the employee. In certifying this class, the district court violated the most fundamental precept of class action law, which was recently re-articulated by the Supreme Court in the Tyson decision. And that precept is this, a court may not give to a plaintiff or a defendant different rights in a class action than that party would enjoy in an individual action. And that is exactly what happened here when the court certified the class in such a manner as preventing Wapakafoundry from actually defending the case based on the unique exposure profile of the plaintiff. Along the way, the district court also made six separate reversible errors, beginning with its commonality analysis. Dukes v. Wal-Mart has taught us all that the real issue is common answers and common evidence, not common questions. And here, the district court said it could find the common evidence in the proffered expert report that the plaintiffs put into the record. Problematically, the district court ignored the fact that Wapakafoundry put in competing expert reports that challenged both the methodology and the conclusions of the plaintiffs' experts. This court in the Meisner v. North Shore decision has said that when there is a factual dispute related to certification, the district court is required to take in all the facts and resolve the dispute to determine whether the case can be certified. More to the point, in the West v. Prudential case from this court, this court has said when it's a battle of the experts, it's not simply enough for the district court to acknowledge the battle and certify the class and figure it out later. Instead, the court must look at the expert reports and determine which expert is more persuasive on the issues related to certification. That simply did not happen here, and that alone is reversible error. More problematically, their expert acknowledged, and I quote, that the plaintiffs encounter exposures to different sets of complex hazardous agents which vary on a daily basis and in an unforeseen manner. So what the district court here actually did was found that the common evidence it could rely on was the lack of a common experience of the plaintiffs. Why is that? They're in different locations? Your Honor, the class comprises, for the FLSA class, six different plants and four different plants for the Rule 23 class, and those plants use three different types of technology for building the cores that then they found the iron parts from. Those different processes require the different inputs of metal alloys. They require different inputs of chemical agents, and the different jobs within the plants, there are 13 different departments ranging from the guys who actually melt the metal to somebody engaged in quality control located at different parts of the plant, cause these people to be exposed to dramatically different types of particulate matter, chemicals, even molten metal. Within the plants, there are different job functions within the 13 different departments. Within those job functions and departments, there are dramatically different and unique environmental controls. Some departments have gigantic air hoods that suck up most of the particulate matter to get it out. Other areas, the employees wear unique face shields that supply fresh oxygen to them while they're working. That type of PPE is put on after they're already being paid. So it is true that from a standpoint of the chemicals exposed to, the particulate matter exposed to, the duration of the exposure, the intensity of the exposure, and the frequency of the exposure, it is dramatically different across the six different plants, the 13 departments therein, and the dozens of job functions within those departments. So you're saying that we've got six plants originally at least, and in each plant you say there's certain different exposures? There are different exposures in each plant, but there are also different exposures in each department within each plant. Well, what I'm trying to look at is the commonality thing as far as what's comparing. The six plants are not, I assume, equal. They are not, Your Honor. The six plants are not equal. So you would have a different condition than others? Yes. You know, I'm still focused on donning and doffing, but it seemed to me that whatever is going on here, it's more of a threat of ingestion, and that doesn't seem to be covered by donning and doffing. We would agree with you, Your Honor, that that would not be covered by donning and doffing. In fact, nothing that the people are exposed to while they're actually working on the plant floor is really the subject of this case. Based on the legal standard the court has articulated, what is the subject of this case is whether or not these people need to immediately leave the shop floor, change their clothes, and take a shower before leaving work or before doing anything else, or whether they can do those things later when they get home. That's the exposure window that matters for compensability in this case, is that duration of time between the end of the workday and when they take their shower. What does the company tell the people in each of these, as you define separate areas, that they should do? The company tells its employees that as a matter of good hygiene and good personal care, they ought to change their clothes and take a shower. They ought to, but you don't require it. We do not require it. In fact, the fact that we don't require them has already been decided by this court. We were up here on an appeal on our summary judgment motions about five years ago, and this court affirmed the district court's finding that there is no employer requirement that these men and women don, doff, and shower at the plant. So, we do tell them as a matter of good personal hygiene and good health care, they ought to do it, but we make no requirement that they do it. The commonality problems carry over into the predominance analysis, and here, unfortunately, the district court really didn't do a predominance analysis. It simply pointed back to its commonality analysis and said that was good enough. As we just heard, it wasn't, but that alone is reversible error because, obviously, predominance requires a weighing of whatever the identified common issues are against, in this case, numerous individual issues. So, how do you think the plaintiffs should have organized their case? Your Honor, I think it's highly likely that the plaintiffs couldn't have organized this case as a class. The dramatic differences are so great among even... I forget the class, so what should they have done? If it was an individual case, Your Honor, I think they should have taken discovery to  One by one? What's that, Your Honor? One by one, each worker? Yes, Your Honor. I think it does need to be done one by one because of the different exposure profile, but also because the legal standard... How many workers are involved? We have about 3,500 employees. So, 3,500 lawsuits, is that what you're thinking? It could potentially be 3,500 lawsuits. That's ridiculous. It is ridiculous, and that's why it never happens. Well, it doesn't follow that because 3,500 lawsuits are infeasible, there should be no lawsuits. Your Honor, what I think follows is if in those 3,500 individual lawsuits, WIPACA were able to defend itself by looking at the exposure profile of the individual plaintiff, determining whether or not that actually constituted a health risk, which is the first prong of the controlling legal standard, and then determining whether or not changing your clothes and showering could reduce that risk, and then determining whether or not doing that at work caused a significant reduction in the risk, then WIPACA would have a fair shot at defending itself in these cases. But when you aggregate everybody under the theory that plaintiff's expert used that says, because we can't figure out what these guys are actually exposed to, we're just going to assume the worst, that deprives WIPACA of its ability to defend itself. And that's exactly what I think the Tyson Court was talking about. So are you saying that the plaintiffs presented no evidence to support their position that these people should take showers at work? Your Honor, they presented the expert report of Dr. Armstrong, who is an industrial hygienist, and he said based on the chemicals that may be present in the plant, everybody should take a shower and change clothes at work and it would reduce the risk of health. But what he didn't do, in fact what he said was not appropriate to do, was try to identify what chemicals and what other substances the individual plaintiffs are actually exposed to. Donning and doffing and showering is not work unless it's shown to be integral and indispensable to the principal activities. And here, because we've already proven no legal requirement, no employer requirement, it defaults to is there a health requirement? So here we have to necessarily look at what is this individual employee actually exposed to? What risk, if any, is being made to his health? Somebody working in the quality control. Well, now you're back to your 3,500 suits. And again, Your Honor, that's a theoretical probability that comes up any time a court considers decertifying a class. If that alone were sufficient to say there should be a certified class, we'd never be here on a Rule 23F petition. This court would never reverse. I don't understand you. You can't be serious in suggesting that the way to handle a problem of this sort is to have a separate lawsuit for each worker. Your Honor, that is exactly what I think the right answer is. No, that's ridiculous. I don't believe it is. I can understand you wanting to group the employee or divide them into groups and say, here's a bunch of employees who are working with these chemicals, you know, and this is dangerous for them. Now certainly, that could be, those people with similar risks could be assembled into a class. Your Honor, I agree with you that, theoretically, that seems like it could be possible. Oh, come on with the theoretical. But what I want to talk to the... Look, if the plaintiffs can establish that there are some number of workers who have very similar, you know, conditions in their job and confront the same chemicals and have the same risks that this witness testified to, then they can be grouped into a class. That would only satisfy part of the problem with the individual factors here, Your Honor, and that is because the legal standard requires us to analyze whether or not the donning, doffing, and showering needs to be done immediately after work and at site, as opposed to some where else. Now you have to look at the different duration of any potential exposure. Again, the exposure on the shop floor is not really part of this lawsuit. It's the taking off of this. You're being irrelevant. Obviously, if you want to group people into a class, there has to be similarity, right? Yes. Having to do with the chemicals they're exposed to, the work they do, the hours, the this or that. Now, are you suggesting it's impossible to group these 3,500 or divide these 3,500 workers into different groups depending on what chemicals they're exposed to, the hours they work, age, whatever? I'm saying, Your Honor, and my light is on, so I'll say it quickly. Are you denying that? I'm saying that... Don't tell me what you're saying. Answer my question. My apologies. Are you denying the feasibility of dividing these 3,500 into groups that have common risk or no risk? It's the same chemicals. Yes, I am, because if you get to that small... Would you just answer my question? Your Honor, I said I am denying the feasibility of it. I'd like to tell you why, if that's all right. Sure, tell me why. And the reason for that is because once you get to find those commonalities, the groups become so small that class action no longer makes sense. How do you know? Because the exposure profiles are so dramatically different. Two people standing next to each other working on the same line have a different exposure... Oh, come on. You have 3,500 people to work with, and you're suggesting that every single one of them has a different risk profile and different chemicals and different... Is that what you're saying? Pretty close to every one of them. Yeah, well, that's ridiculous. What possible basis could you have for thinking that 3,500 workers all have a significantly different risk profile so that you can only deal with them in 3,500 different lawsuits? Your Honor, it starts with the different exposures they have. It continues to the different health factors they bring. They don't all have different exposure. You don't have 3,500 different exposures. Your Honor, we... That would be ridiculous. We believe that they... They're all different, 3,500. Not every employee... They all have different chemical environments. They are exposed to dramatically different chemical environments based on the job function. They can't be right. Based on the department. There are some people working right next to each other. Right. Of course they're exposed to the same chemicals. At different durations and different frequencies and at different intensities. What do you mean? They're working together. They may be working together with the same hours. Right? They may be... Working together. Your Honor... In a plant, you don't have one person working from 9.05 to 9.10 and the next from 9.10 to 15. You have people working the same time, same machinery, same exposure to chemicals, don't you? There are small groups of people whose exposures are very similar, but then there are other factors that come into play that make them dissimilar, including the health risks that they bring to the table themselves. This is about reducing risk of health and the exposure duration because people live... Quite honestly, we have employees that live two blocks from the plant and employees that live 60 miles from the plant. What's the largest group that do the same kind of work? The largest group that do the same kind of work is probably in the dozens of employees at different departments and different... Over three shifts at each of the... So there are dozens of people that could be grouped? They could be grouped from what they do at work... I think that's what... But I don't believe... I'm going to probably hold you up a little bit longer here, but I really think, as you know, I was in this last one and disagreed with some things, but it does appear that there are some, in some factories, some pretty toxic things that people have to wear masks for and have to protect themselves on the spot, and that's already done. They seem to fit into a much different category than many others, and I don't know how many of those subcategories there are, but I think what Judge Posner is exploring is it can't be... They're all 3,500 suing at once, but there seem to be, as Judge Kaney pointed out, certain groups. We've got six factories here, even before they were decertified. Correct. And that the six factories, there are different procedures, different things used. And the other thing, looking at this, it seems that the expert was concerned about some kind of a dermatology issue, and it seems to me whatever permeates all of these factories is what you might breathe in, and there's nothing addressed in this. And when you wear, I guess, is everybody required to put on a certain clothing when they get there? The clothing that everybody's required to wear is a cotton shirt, cotton pants, steel toed boots, hard hat, ear plugs. That's what they don in Doff or whatever. Correct. Are there some who put on other things, like the ones I described in that one section where they have heavy duty? They do, but they put them on after they're already being paid. Okay, so that's built into their pay. Correct. Yeah, so okay, that was another issue we had with that U.S. Steel case. They bargained for that, and instead of donning and doffing and getting paid time and a half for taking a shower, they put it all into the pay scale for the varying jobs. That's right. And this is what I'm trying to poke here, is that the issue of donning and doffing, you take the shirt and pants and whatever and take them on and off. That protects the skin, maybe not the face or the hands. And so you don't take a shower, and the way the expert described it is some basic chemicals that are in a lot of these things they're working on, grinding and doing this and whatever they do in the foundry, are different. And if there's any potential damage, which I don't, it's not in the record, it would be breathing it and getting it in your lungs. And donning and doffing does not address that. And that's my problem with this case. I agree with everything you've said, Your Honor. That is correct. The donning and doffing and showering after work is not going to affect the amount of particulate matter they may be exposed to inhaling while they're on the shop floor doing their job. I see my time is up. Okay, well thank you very much, Mr. Olson. Mr. Snodgrass? Good morning, Your Honors. My name is Joe Snodgrass, and I represent the foundry workers in this case. We think that really the fundamental dispute on this appeal is whether the district court used his discretion in handling the expert evidence. And in light of the procedural procedure of this case, at the time of certification, particularly that WAPACA informed the district court that it was going to file a Daubert motion, did not really outline what that Daubert motion was, deposed the expert, and then chose not to ever file a Daubert motion prior to the time of certification is really dispositive of a lot of the issues that are before us at this time. You're saying they waived all the arguments? No, I'm not saying they waived their arguments, Your Honor. But this court, this circuit has issued very strict guidelines starting in 2010 with American Honda that said that if a party files a Daubert motion before class certification, the trial court must rule on that Daubert motion before certifying the case. And I think that was followed up in 2012 in the Messner decision. Last year, in 2016, in the Clean Products LLC versus International Paper Company, this circuit said, quote, where there is no Daubert challenge, a district court may rely on expert evidence for class certification, unquote. And what the citation was in the International Paper Company case from this court was the Tyson Foods versus Buofaccio Supreme Court decision. Tyson Foods versus Buofaccio was a Donning and Doffing FLSA case. And in that case, the Supreme Court applied a very linear set of logic. If there's no Daubert challenge to a certification expert, there's no legal error in admitting that expert evidence. Once expert evidence is determined to be admissible, the persuasiveness of the expert is for the jury, the exclusive province of the jury. And in the absence of a Daubert challenge, the Supreme Court held in 2016, a district court can deny an appropriate classification motion supported by admissible expert opinions only if it determines that no reasonable juror could have believed the expert. Buofaccio makes sense, and it's fair to the trial courts. Think of it this way, in fairness to Judge Griesbach in this case. Judge Griesbach was dumped with expert reports from numerous industrial hygienists. There was no direction from the defense as to what portions of any opinion they deemed inadmissible and why. Just no direction whatsoever as to the expert report that we provided. Did they provide experts? They provided experts too. But again, remember the Supreme Court admonition that if there's no challenges, they're deemed to be admissible, and it's the province or the jury to flush that out. Instead, WAPACA here would have a trial court, unguided, and its staff trying to go through Ph.D. level industrial hygiene expert reports and try to figure out winners and losers. And I don't think that's appropriate. And I think that's why the rules that this court laid down starting in American Honda in 2010 and the Supreme Court laid down in 2016 in Buofaccio is pretty clear. You can have a rigorous class certification analysis. That's great. That's fantastic. I would encourage that. And I would also encourage all the parties that want to present their Daubert motions to do it. Do it at the time of certification. They, in fact, informed the trial court they were going to do it, but they didn't. Now we're up on appeal, and there's no guidance, no attack, nothing about which expert opinions should be in and which should be out, and we're talking about all these expert opinions, but nobody challenged them. And we think that the bright line test and rule that was laid down in American Honda, if you challenge under Daubert, you have to resolve before class certification. It means something. And the failure of Wapaka Foundry to move on Daubert, especially after they deposed our guy for seven hours, Dr. Armstrong, for seven hours, it's improper now on appeal to come in and say. You're saying that they did have, in other words, their expert's testimony conflicted with your expert's testimony? Correct, they did. But you want Daubert to make a decision by the court which is to be believed? In any individual case, Your Honor, if people are going to present expert evidence to a juror, before the jury hears it, they're entitled to have Daubert hearings. Determine what is and what is not admissible. But let's just take a hypothetical. Let's say nobody challenges under Daubert. All the expert evidence comes in. That then becomes a question for the jury. If no one's going to object to the evidence, if it's admitted into evidence, now it's a question for a jury. So where do we go from here? Well, I think that you follow the clean products decision. In the absence of a Daubert challenge, a district court may rely on expert evidence for class certification. Okay, so now it's got a class, I guess. And I say, where do we go from here? Because the district court decertified part of this. Correct. It divided Tennessee and Indiana, and now we're left with, what, is it three or four in Wisconsin? There's four plants. They're all within the eastern district of Wisconsin where the case is vetted. All right, now what about the others? The court decertified and ordered those severed and transferred back to their home district. So they start all over again? Well, because he's severed and transferred, no, they get the benefit of the court record. They don't start all over from scratch. What are they? You got the same lawyers? Are you going to try it in different states? Where this case left off procedurally, the court ordered separate complaints to be filed for those jurisdictions, but before he sent them off to their home districts, this court granted the Rule 23F, and that process was state. And that process what? That process was state. The court has not sent those and has not ordered those cases back to their home jurisdictions yet. But the ones that he reserved for his district, how many workers are involved there? Because numerosity wasn't challenged, committed to memory, but thousands. Thousands in the four plants in the eastern district of Wisconsin. Well, there were 500 opt-ins. There's 500 opt-ins, I believe. In Wisconsin. No. The 500 opt-ins were for all six plants. Remember, and this is one of the issues we have on appeal, the Rule 23 class is a state law Wisconsin class. It's exclusively Wisconsin law. The folks in Indiana and Tennessee have no rights. They couldn't be in this class even if they wanted to because they have no rights under Wisconsin law. So there's two separate things here. We have a Rule 23 Wisconsin class now. That's what this appeal is about. And then we have the separate issue involving these Tennessee and Indiana workers. And what we've said in our brief is, respectfully, you folks do not have appellate jurisdiction over the issues concerning the Tennessee and Indiana workers because they're unrelated to any class certification order. So you're saying they're not in the class. They're not in the class, never have been, never moved for class certification, never requested to be in a class. And that's why, under Rule 23F, this court does not have the ability to look at that. In other words, this is just a simple sever and transfer order. And ordinarily, I think you can only get those up to this court on a mandamus or a 1290B. So you're saying there are these, say, roughly 1,000 workers in Wisconsin, so they're the class or that's left to the class? Yeah, and I said thousands with an S. But that's a large group. How would a trial of such a large group proceed? So we've had different trial plannings over the years in this case. At one point in time, we were going, before the court initially granted summary judgment, we were going to try a grouping in one of the plants for one of the departments. We proposed in this class— How many people would that be, one of the plants and one of the departments? At that time, it was just an FLSA case. It wasn't Rule 23 class. And I think that involved about 75 to 100 opt-ins in this one big department. And that would be whether or not being paid for donning and doffing is a legal obligation. Are decontamination activities compensable? In our class certification brief, we asked that one of the early trials involve the folks that have to wear flame-retardant uniforms because flame-retardant uniforms have to be left at the plant and with the commercial person because if the workers launder it at home, the flame-retardant capacities could come off. And there's big advertisements out in the plant for the workers, use the washing service that we provide because there's toxins in the clothing and it might wear off your flame-retardant properties if you don't do it. So we think that's a stronger group. We wanted that, one of those groups, to be included. I think that's about half the workers. So we've proposed different things. Half the workers fit that category, did you say? What's that? Half the workers in one plant. Yeah, their flame-retardant uniforms. In one plant. Yes. And you thought that was about 75? I'm sorry? 75 workers, did you say? No, I apologize. So we proposed that recently in 2016 to do a flame-retardant grouping. Back in the 2011 timeframe, when it was just a pure FLSA case, the trial court had us set up to do a department in one plant, and that grouping was 75 to 100 people. But before that could get to trial, the district court granted summary judgment against us. Your Honors, we're part of that process that went up and down. Part of our process. Right, right. But anyways, so there's been different proposals over the years. As it relates to damages, and we just want to talk about damages briefly, because really most of their complaints go to damages. We had, and the district court did, some Daubert work early on in the case on what are called time study experts, the same type of experts that are at issue in the Tyson versus Buofaccio decision where somebody comes in and does aggregate measurements of time and uncompensated time, et cetera. That's one way to potentially try these quote-unquote damages. Since this case be accepted. The time it takes to doff and on. Yeah, correct, correct. And then the other issue during the course of this litigation, the Butler versus Sears Roebuck decision came in and discussed the concept of individual hearings. We have not briefed that issue, whether or not it should go to a time motion study versus the individual hearing. But the important thing is, and I think Your Honor was onto it a little bit, this is, as far as superiority goes, superiority in a class action setting, the number one consideration, is it a negative value suit? These are small claims, 500,000, 3,000, 6,000, whatever. They're small claims. I understand there's fee shifting under wage and hour laws, but that does not negate the fact that these are still negative value suits in this case. Why? Because, as you see from the very robust industrial hygiene reports, this case involves and needs experts. This court has held that in FLSA cases, you can't get your FLSA experts' time and money back. In other words, it wouldn't make sense to spend $20,000 to hire an industrial hygienist in an individual case when the most you can get is $3,000 plus attorney's fees. So this is a case that needs certification and grouping. And it's only fair to the judge because even if this court decertifies, there's still hundreds of opt-ins. There were dozens. There was like 70 opt-ins before the court even certified it. There's going to be lots and lots of cases no matter what happens. It is unfair to Judge Griesbach to expect him to handle these all differently or somehow make people file new suits, probably only to get TAG related and come right back to him, and then he's got to deal with the issue again. We think, in fairness, the best way and the appropriate way to handle this is to let the cases go together with the groupings. It would just make too much sense. How far back does it go? I mean, there's a whole lot of people that don't work there anymore. Correct. This lawsuit was filed in 2009. Okay. So you've got that many years, eight years, where people have different claims, different amounts, about how much time it took back then to don it off. And last month I just sent, I sort of made a calculation that it might be that people taking that amount of time, it might amount to about $100 per week to don and doff. I don't think so. That's the overtime. I don't think so. That's based on a $20. If somebody's making $15, it's less than that. But if it's $20 an hour and now you go a time and a half, that's $30 an hour, and they figured it would be about 20 minutes on each end. I put that calculation in there. So it comes out to about $100 a week. Well, you're assuming that there's every single week somebody works more than 40 hours. In other words, like the Thanksgiving weekend, if I don and doff and it takes me 20 minutes a day to don and doff, but because I only work 21 hours that week, I'm out of luck. I don't ever get that money. The FLSA only lets you get time for overtime if you pop 40 hours. So there's plenty of them. I over-calculated then. Yeah, there's plenty of them. But that didn't count for Thanksgiving and Christmas and that stuff. Well, any vacations, any days off, Memorial Day, Labor Day, et cetera. Sick days. Sick days. They paid for those. Right. But nobody's getting donning and doff. In other words, I'm never going to be able to get, under the statutory schemes, I can't get 100% of their time back. I can't. If we're going to affirm this, we've got to affirm the decertification for Indiana and Tennessee. What about that? We'd have to affirm that split as opposed to keeping the thing intact, I guess. Well, keep in mind, WAPACA moved to decertify. We said we don't oppose it, Judge, we just think you should sever and transfer it. So nobody wanted the Indiana and Tennessee peoples in the Wisconsin Corps. Okay, so, I mean, the trial court ordered it. We didn't want them. WAPACA didn't want them. So if you guys really want them, you probably have the power to do it, but nobody else wants them in Wisconsin. I hate to ask this, but have any personal injury suits been filed in these eight years? Wouldn't be personal injury work comp, but, yes, there's been lots of work comp claims over this stuff. What's that? Yes, workers' compensation. Yeah, I mean, everything from silicosis, you know, we talked about the OSHA logs and the dermal injuries that people are suffering, not to just their hands and work stuff, but down their bodies because the dust gets in there. But, yeah, there's work comp claims in that. They're not lawsuits because they're employees. Not a part of this case. Okay, well, thank you, Mr. Snodgrass. Mr. Olson, do you have anything? A few things, Your Honor. A lot of this back and forth with Mr. Snodgrass about where do we go from here and how would we try this case is somewhat enlightening because he's never submitted a trial plan in conjunction with his Rule 23 motion to explain exactly how we would try this case. And I would also point out that, you know, the instructions from this court to mean that a trial plan is required. And there is no trial plan. The Bellwether trial he spoke about was before the summary judgment ruling. That was when it was still plausible that this case was going to be decided on rule of employer or decided on a legal requirement. Also, just to hit, there is no employer requirement that fire-retardant uniforms can't be washed at home. That's simply not true. The documents in the record say you should probably leave them here because we'll make sure it's done right. But if you take them home, here's how you need to wash them to make sure you don't damage the fire-retardant agents. You're talking about that one segment where they had the whatever. With the fire-retardant. That was the 75 people? Correct. Correct. And also his calculation that this is a $5,000 case for these plaintiffs, that's based on his assumption that he put into the briefing that we should per day per employee on a five-day work week. There's nothing in the record that supports that those numbers are right. His own time motion study expert says that the average amount of time is 26 and a half minutes per worker per day. There are people who have testified through interrogatories in this case that they spend one minute changing clothes at the beginning of their shift and one minute changing clothes at the end of their shift. There's a guy who put in an affidavit that spends 30 minutes on either side of the shift doing it, and he even takes a sauna because we've got a sauna in one of our plants at the end of his work day. So the numbers he's used to prove a negative suit are fabrications of his own imagination. That's not what's really here. And this case goes back to 2006, not 2009, because there's a three-year look-back period. So the fact that we need to certify this based solely because it's a negative value suit is just not correct. And also the discussion about the lack of a Daubert motion. What is clear is this court has said in the Westview Prudential case, when there are competing expert reports, it's not enough for the district court to say, we have a battle of the experts, we'll deal with it later. The district court, based on what this court said in West, is required to determine whose experts are more persuasive on the issues related to certification. That never happened here. Thank you. Okay. Thank you very much. Next case for argument is Hudson v.